Good morning, and may it please the Court, Richard Stone for appellants. In this case, the Court could only deny the injunction requested by appellants by departing from at least six cases which had held that the unauthorized streaming of live television over the Internet created a multitude of likely irreparable harms. In four of those cases, the irreparable harm was found on the exact same record that we have here, including the same senior Fox executives' testimony. And in all of those cases, the same licensed alternatives existed. Nonetheless, each court found there was irreparable harm. You're talking about district court cases? And the Ivy case, which is out of the Second Circuit. And what did the district court do in that case? The district court in that case found irreparable harm. Okay. So in every case, we have a district judge who has found this, but we have an abusive discretion standard. Absolutely, Your Honor. Absolutely, Your Honor. And that's where I'm headed with all of this, is an abusive discretion can occur in basically, you know, two compartments. One, misapplying the law, misapplying the standard. Second is illogical, implausible, clearly erroneous findings of fact. So we have proof of that here because we have an unbroken line of authority on the same exact record, the same witnesses. Well, it's not the same exact record because none of these deals with this technology or anything that much like it. Well, they did. No, absolutely. All the technology swing is, is it takes a digital or analog signal. We have a lot, as I understand it. Here, did any of those cases involve an instance in which the, there was a license of the actual, of the, of getting the material to the customer? That was licensed, right? No. These were all unlicensed. All right. But here there was a license. Right, which is where the court, I think. All right. So it's not on the same record right there. I think it's actually a stronger record. And maybe I should correct myself. It's actually a stronger record because the license here, unlike in those cases, the license here expressly prohibits the conduct. In other words, the parties have already bargained and negotiated. That gets to an issue that, I'm sorry, I'm slightly all over the place here. But I, I learned in first year contracts that you don't issue injunctions in contract cases. You cite one case saying you do in New York and they cite one case saying you don't and it kind of goes by the boards. Nobody is paying very much attention to it. And neither of you seem to think that, that if, if we had nothing but the contract case, we would be in the same place on the injunction issue. Do you think that's true? No. I think you can certainly enjoin a contract. Well, yes, in limited circumstance. Applying the same for? Well, no. Usually they're not the same, but. But applying the, the same four components in equity as set forth in the eBay case. In other words, if those four factors hold true in a contract case, you may enjoin a contract. In, in the Ninth Circuit in particular, if a party exceeds the scope of a copyright license, that is also deemed copyright infringement, which of course historically has been enjoined. And, and what happened here and why I think there's clearly an abuse of discretion is exactly the point Your Honor made. So we have these other cases where there was no license. And all of which the courts found there was reputable harm from the same conduct. That is, unauthorized streaming of broadcast television over the Internet. Here the court made two mistakes of law. The first is the court looked to the fact that there were, there's a market for others to license delivery of content on the Internet. And concluded that necessarily any harms are quantifiable and calculable. And that's exactly what eBay said you cannot do. It also turns the facts and the law on its head. In other words, the existence of a market for licensing these rights actually proves irreparable harm, which is what was found in all these other cases. But, but, I mean, another reason why it seems to me that the existence of the license matters is that you know who you're talking about, i.e., the people who are getting whatever is, you know exactly who is getting whatever is unauthorized. That was true. Well, so the first point is the court sort of ignored the fact that licenses to other folks actually proves irreparable harm because an unlicensed rogue distributor puts pressure on those relationships, and that was recognized in all these cases. Secondly, and a point Your Honor is making, is that there is an existing contractual relationship with Dish and Fox. No, I'm talking about the fact that there's an existing, yes, because there is, there is also an ascertainable set of customers. Right. And the court tried to use that as a distinguishing factor, and it's implausible and illogical for the following reasons. The other services referenced, the Berry Driller and the Ivy case in area were all subscription services, too. We haven't reviewed any of those cases anyway, but they're still coming in the other direction. But still, I mean, I don't know why I'm bound by them. Tell me why I'm bound by them. Well, I think it's, it's, it's what Chief Justice Roberts said in the eBay case, that you do look to historical practice, and generally like cases should be decided alike. And I think what it tells you is if you have this line of authority, the court needs to have a reason based in law and logic to depart from that line of authority. If not. One of them could be, I thought, I think they're wrong. Pardon me? One of them could be, I think they're wrong. But then, even so, you still have to have a reason based in law and logic. Otherwise, we're now into simply capriciousness. And. You don't usually come to a court of appeals and argue district court cases and tell them that you have to follow them. Well, one is, Ivy is a Second Circuit case. In the area case, the district court found irreparable harm, and now the Supreme Court has found liability in an injunction bill issue in that case. But Ivy was very similar facts as this case, and it's out of the Second Circuit. The other cases are district court cases, but the reasoning applies in full to this case, and that's the persuasiveness of them. I'm not saying the fact that there's a district court case is in and of itself persuasive, but you have to look at what was the record, what was the facts, and what was the legal reasoning. Did the court here have some logic or law-based reason to depart from this unbroken line of authority? And, in fact, the court did not. The license here actually prohibits the exploitation of the Internet. So reference to this. There's a dispute over that as well. I don't know if there is anymore, but first of all, under copyright law, all rights are reserved unless granted. That's a merits-based argument, and the district court focused on irreparable harm. So isn't that a significant distinction? I mean, she set aside the merits and focused simply on the irreparable harm standard prong. She did, and I think with good reason. If you look at her order, she walks through the terms of the license agreement with DISH and knows that it's very limited. And in the copyright realm, they would have no right to transmit our programming over the Internet unless we granted it to them. There's no dispute. There's no grant of any rights to transmit over the Internet. That is undisputed. But the contract went beyond that and said, not only are we not granting you the right to transmit this over the Internet, we are expressly prohibiting you. But that, again, that's a merits-style argument, and here I think the focus of the district court is the license matters in this case because you have a defined universe of customers, and then you can, the focus seemed to be whether or not you can calculate damages, whether there's irreparable harm in light of this evolving market and the other factors. But there is no way to, that a reference to a license that prohibits this exploitation can provide any ascertainable damages. In other words, this is an agreement that said, you shall not do this. So by the way. Kagan. Ginsburg. Again, to repeat what Judge Soberos has been saying. There is a dispute about whether that's what the contract means in context. That's a merits dispute. Do you want us to, and I guess this is a more generic question. If we were to, hypothetically, if we were to reverse on the irreparable harm, we would have to ignore all of that and do it on another. We can't do it on the basis that this is what the contract says, because if that's what the contract says, that is the merits, and no one's decided the merits here, I mean, even on a likelihood basis. What would we, what would, if we were to think that the irreparable harm was an abuse of discretion, what would we do next? Would we remand to the district court on the likelihood issue? I think on the likelihood issue, because we're dealing with a contract, it's de novo review, that's an issue of law. I think you can simply, and I think that's right, the reason the Court jumped, if you will, to irreparable harm, that the contract is quite clear. There is no grant of these rights in that contract. That much is undisputed. Can I ask a practical question? Please. Where is this case sitting in the district court right now? It's in the midst of discovery, with a discovery cutoff coming up in August and a trial in early next year. Okay. But on the merits, wouldn't the district court be the appropriate place, because she could evaluate the technology here in light of the Yario case and a more fully developed record on the merits? I think that is unnecessary, and, you know, as the Federal Circuit in the Bosch case pointed out, that ends up punishing appellants for an error of the district court, and the injunction is further stayed. And here it's quite clear there is no grant of rights. So the first premise in copyright law is there has to be a grant of rights to do something. There is none. There is a prohibition as well, which says you shall not transmit over the Internet or authorize anyone to transmit over the Internet. Dish has relied on the law. And then Aereo addressed that, the Aereo decision. No, that's a completely different technology. Well, no, actually, in Aereo, in the – and I was involved in that case, and so part of it may be my personal knowledge, but I think it's also revealed in the decisions of the district court, I know, and I believe in the Second Circuit. In Aereo, the argument was that Aereo is simply the equivalent of attaching a sling box to a DVR. Well, that was the argument, but the Supreme Court has all sorts of caveats in the opinion about how this was about Aereo and nothing else, and a lot of the nothing else seemed pretty similar to sling box. Well, the – from the argument of the Supreme Court, the something else is really I'm talking about the opinion as written. Right. And I think what – where that came out of is, and it's at the very end of the opinion of Justice Breyer's opinion, the distinction he's drawing is from cloud locker storage services. It goes on about – I mean, it's very important that in Aereo there's a physical, central place everything's happening and that there was no license of any kind and that the – and a number of other things. I mean, I don't know which way it comes out, but I don't know you can – I don't think you can stand here and say it's all the same thing. So if we were to deal with that, we'd have to have briefing, right? I mean, we couldn't have decided ourselves based on the briefing you've got – we've got now. I think you could. I mean, obviously, I can only argue that. I mean, it's up to Your Honors to decide, but I think you can. And Justice Breyer, what he emphasized, I mean, he described what the Aereo system was, but in the opinion he also pointed out that the statute deals with any device or process and went on to make clear that the particular technological components are – Can I ask a question about the technology here? Sure. I mean, one thing that struck me and one reason I'd be quite leery about deciding anything in the merits is that there's a little bit of – that the record isn't very specific at all about the technology. And at one point in your applying brief, you say that you're not complaining about the device, you're complaining about some service. And you say that they're charging for a service, and you give a – what – and they say, oh, no, it's only a – all we're doing is building this technology into what we're giving for free to the – with no additional charge to the people who are subscribing. Which is true, and how do I know which is true? Well, the district court did make that specific finding, that we're dealing with two new services that came into being. Well, what do you mean by service? The services that we're going to provide for you, this software built into these – this hardware we're giving you. Right. And so we are providing a service where if you don't pay the monthly fee to DISH – The ordinary monthly fee, not a different monthly fee. Well, there's a DVR fee that goes along with these souped-up features. Regular monthly fee, okay. But if you don't pay your fee for DISH, you don't get these services anymore. Also, as their declarations point out, if any – But I don't understand what you mean when you say that it's not the sling box you're talking about. It's not. It's a service. So in other words, we're not suing a technology here. You could go to a swap meet, for example, and somebody could be making duplicate VHS tapes out of a VCR machine and selling them. It would clearly be an infringement. If you sued that person, obviously you wouldn't be suing on the VCR technology. You'd be suing for the service that person is providing using that technology's tool. Sling is nothing more than a technology tool. It can be used for non-infringing purposes or it can be used for infringing purposes, just like a VCR. This is a commercial service, which they charge a monthly fee for. If you don't pay the they don't have a license to do that. That is undisputed. There's a provision that actually prohibits not only doing it, but authorizing it. So that's why I'm saying when you have this, you sort of transcend every argument that could be thrown our way because they can't do it themselves and they can't even authorize it under the agreement. Could you take that argument that it's a service, say four or five years from now when all of the technology is settled and the dust has settled, there will certainly be a renegotiation of the RTCs and this will all be factored in, I would think, within the licensing agreement? That's a very good point and that's a huge problem because if you're DISH, I mean, this is the irreparable harm that has been recognized in all these other cases. But how could that be irreparable harm? Because it would assume in four or five years you could, the FOX and others will come to an agreement as to what this service is worth so it can be valued. But without an injunction, we're now in a position, and I'll quote from the Presidio Court, which I think this is a very apt quote, a calculating infringer may thus decide to risk a delayed payment to obtain use of valuable property without prior negotiation or the owner's permission. In the next round, if I'm DISH, it's like, you know what, I don't need to agree to your terms or your restrictions because I could probably just do it anyways and there will be some royalty set. Could somebody go into Best Buy and buy a Slingbox? I don't know if they sell them in Best Buy. Or something like it? There's very limited Slingbox availability. The problem with the stand-alone device, quite honestly, is there's no user support anymore for them. But somebody could theoretically buy it. All right. And if you had it, could you connect it to your TV and do exactly the same thing? Which is exactly what consumers could do in the Aereo case. But when you have a service It's not, in my understanding, in the Aereo case, you needed to have these, this central antenna system. No, they created the mini-antennas simply to avail themselves of a legal loophole by the cable vision case, which was then shut down by the Supreme Court. There was no need for it technologically. But what the crux of the case, though, was this was a service where you paid a subscription fee to Aereo, 8 bucks a month or 12 bucks a month, depending on the bells and whistles. And you got TV over the Internet. That was unauthorized. And the Supreme Court, as the Supreme Court found, the statute covers any device or process. Yes, Justice Breyer described the system, but in the very next page he goes on to say, but it doesn't matter if it's the personal copies of the user, because it's any device  It's simply the components that get the TV on the Internet. You're not claiming that if somebody had a sling box, that the person who manufactures the sling box is what, not directly liable? That's a, yeah, that's a completely different analysis, Your Honor. But in TULLO, T-U-L-L-O, in the Ninth Circuit, the court said selling a product is completely different than a commercial service. And a commercial service does not stand in the shoes of the user and is a direct infringer, and that's what we have here. We have a monthly service, just as we did in Aereo. The only difference is we have a license for other rights, satellite TV, not Internet, and we have a license that's the same. Sotomayor, The service is essentially a rental of this box, is that right?  No, it's not. It's, it's, it's, it's, it's. But this is, this opens back to why I'd be very reluctant to decide anything at this point, because I think the record is very marking on this point. Well, I'm comfortable with the merits, either in this Court or in the lower court, to be honest, but I think the issue here is the court was clearly erroneous in not finding irreparable harm, particularly here where you have a license that prohibits this distribution of the Internet. As the Salinger Court pointed out, you now are implicating the First Amendment right not to speak, and the court is in, in effect compelling us to speak through DISH, to make content available through DISH, albeit for some payment later. Well, compelled speech, even with some payment later, has always been recognized as irreparable harm as the Salinger Court. The test has been out of time, and I bet you'd like some rebuttal. Thank you very much, Your Honor. Good morning, Your Honors. May it please the Court. Josh Rosenkranz, representing DISH Network. Let me start where Judge Berzon went with regard to what these technologies actually were and what they are now. And it actually is pretty clear in the record. I refer the Court to page ER 856, in which the technology expert explains that the 2005 Sling technology, which has been in existence now for nine years, is, quote, the same technology at issue in the current case. That was actually, that was the market analyst. A quote, introduced no new capabilities. That's page 850, same expert. The district court found as a matter of fact, and I'm quoting here from page 306, there is no evidence that these new technologies are uniquely threatening. What the district court concluded is what was clear from the record. That this technology has existed in exactly this form for now nine years. There is no difference between the Sling box, which yes, Your Honor, you can buy from Best Buy. Technologically, and the Sling features that are at issue in this case. So when they say this is a service, what they mean is that you're essentially not selling the box, you're renting it? I don't understand what they mean by service, Your Honor, nor do I understand the legal relevance of using the phrase service. They made the same argument last time the case was here. We were renting the box. There was way more interaction between the, between DISH and the box with regard to the block recording feature. Wouldn't the service be the app that DISH provides? You can click on it and then stream on the internet and do all these neat things that can get you away from the TV and watch it. Your Honor, you would have to ask Mr. Stone what he defines as the service, but the app is the same. With the Sling box, you get this piece of hardware. It's got a chip in it. It is the same exact chip that exists in the DVR. Now, you can also, at the same time, you also have to download the software. You'd have to do that with the Sling box as well. There is no. But you're providing some real value to your customers. Isn't that the service? Of course we are, Your Honor. The value that we are providing to our customers is the retransmission that we take Fox's signal off of the AR. We modulate it in various ways. We pay a lot of money for the right to do that and then retransmit it to the customers. The customers are paying for that. The customers are paying for that. They are not paying extra for this DVR technology. And to be clear, this DVR technology sits inside of a box that is in the complete dominion and control of the customer. That is true of Sling box. It's true of this new version. And I call it a new version. It's actually not new. We introduced a box with this same capability four years ago. And Fox issued no complaint. Digital portability and Sling technology have both been around for nine years. And in fact, the last time we negotiated a contract, which was in 2010, Fox negotiated a press release. It's on page 427, referring to the box as, quote, the world's only DVR. They say they didn't write that part of the press release. You wrote that part. Your Honor, they negotiated the press release. It was in there. They have to have read it. And if their belief is that either the contract or copyright law prohibited DISH from providing a DVR that allows customers to send themselves signals over the Internet, that was a very good moment at which to say it. And I would also add, most of DISH's competitors have the same technology as well. And that's on page 861 of the record. Fox lets them do it. Time Warner, Comcast, DirecTV, their DVRs are all doing the same thing. Well, they may think they're getting paid for it some. Which only goes to the point of irreparable harm. There is then a market for that additional piece that is the DVR capability that can also be used by the customer to send themselves glee over the Internet. Now, in this PI motion, Fox challenges any DVR that has either the Sling capability built into it or that you attach the Sling capability to it, at least any DISH DVR. Now, that includes the DISH DVR that was on the market four years ago. Fox — What's the relevance of all that? Just that there's no — the general notion that you don't have irreparable harm if you wait? Well, two pieces of relevance, Your Honor. First, that, yes, that you don't have irreparable harm if you wait. But that rule is a rule with lots of exceptions. Absolutely, Your Honor. The district court was fully capable of figuring out the exceptions. But it goes to a second piece, which is what the district court used it for. Fox comes into this Court acknowledging that it did not produce evidence of harm that it actually suffered, not in the nine years that this technology existed in the marketplace. Now, if it hasn't suffered any harms from the nine years that this technology existed in the marketplace, then it is — the district court was well within its rights and it's just — It would be helpful to me if you went through the harms they're actually claiming. I mean, my understanding is that they're not really claiming, because it's not irreparable, the harm of whatever incremental cost they might be able to collect for an additional license for this Internet transfer. But they seem to me to be saying three things. One is there's some inherent interest that they have in controlling the ways in which they're — they disseminate their material. Two, that this issue about the infection of negotiations with other people, and then counting the advertising. So it would be helpful to me if you addressed those. Of course, Your Honor. I mean, the district court did go through each of them one by one. And my overarching point before I go through those three individually is that the district court did not apply any categorical rules, which is the legal argument that Mr. Stone is making. It went through each of them. It assessed the evidence on both sides. If it had adopted a categorical rule, it could have written a much shorter opinion. This one fact appears in the record, therefore there is no irreparable harm. But, no, as to each item that Mr. Stone refers to, the district court included it typically in only one or two of the assessments of harm, and only as one of several factors. So to go to the — to Your Honor's question about the specific harm. So there's this notion of harm to negotiations, that if DISH is doing this, then other so-called MVPDs, paid TV providers, DISH's competitors, will also request it. What FOX ignores is that they're actually doing it, so they don't need to request it. They're doing it now either by license or not with tacit authorization. Now, what the district court said — I understand what you're saying, therefore, is they're going to come back and say we're paying for it, and why should we be paying for it? We don't want to pay for it anymore. Sure. And the district court credited our expert, which said that's not the way it's going to work. The way it's going to work is FOX is going to say, but I acknowledge DISH isn't paying for it, but we're suing them for it, and we'll sue you if you do it. And so the conversation, according to our expert, wouldn't work out that way. It would also be the case that what you end up doing is we're negotiating essentially a most favorable nation provision, that if DISH ends up prevailing, okay, we'll negotiate that — excuse me, if DISH ends up losing, we'll negotiate that you get to do it as well. Harm to — in terms of ad revenues, what our expert did was to say two things. First, there will be no impact on ad revenues. That the blip from the additional use will simply not affect — from these additional unrecorded eyeballs — will simply not affect the ratings under Nielsen. It's just too small. But the piece that the district court adopted was the piece that said, well, it doesn't matter whether Nielsen is measuring these eyeballs. These eyeballs are being measured. The gap in Nielsen is a measurable gap. Well, I understand it's measurable, but no one said they were actually measuring it. No, yes, Your Honor. What Mr. Rapp said was that other services fill the gap, which is to say that they have ways of — you know, based upon existing — We have ways, but whether they're doing it as to this particular service, we don't have anything in the record. Yes, Your Honor. What we do is we have the district court crediting Mr. Rapp, saying that the other technologies fill the gap, and the gap was specifically directed at Fox's argument that there is no data out there by which we can measure these additional — Well, but Fox itself — this is what I wondered about. Fox and other — as you say, there's a lot of this going on. So if it isn't being measured, it isn't being measured for anybody. So if there's loss going on, then everybody's losing it. In other words, if they — if Time Warner is providing the service, whether they're providing it on licensed basis or unlicensed basis, if nobody's measuring their advertising, nobody's measuring their advertising either. Right. And, Your Honor, Mr. Rapp's point on pages 866 and 867 is they are measuring it. They're measuring it in real time. That's what the district — But if they weren't, there'd be no competitive loss because nobody's measuring it. Well, another good point, yes. There'd be no loss vis-a-vis others, but, of course, others are also providing the same technology. And another point on that is that precisely because others are providing the same technology, the — well, let me just back up. Let me say it a slightly different way. Another thing that Rapp says about these lost eyeballs is that they're actually not lost. The more you watch TV, the more you watch TV, period. If you're picking up TV on the Internet, you are getting hooked on a show that you would not otherwise be watching when you're at home, and you get the eyeballs that way. Let me turn, if I may, to Mr. Stone. Telling you to a person who does not know how to turn on the TV, so. Well, yes, I am as well. My kids turn it on for me, including my kids who are sitting on the couch, each watching their own screen. And it's not, I shudder to mention, in open court on a dish service. So these other cases — I mean, Judge Berzon was — is right in observing that those are other cases where district courts exercised their discretion in — on the basis of the record as it was presented. They're not binding to this Court, but they're also different. They're different for some of the reasons that Your Honors were discussing with Fox, but for four basic reasons. The first is, unlike the defendants in those cases, Dish presented its own witnesses who demolished every single one of Fox's claims, one by one, and with a nuance and a reference to the way the marketplace works, that the district court simply found more credible. Second, in those other cases, the plaintiffs promptly ran to court the moment that there was a threat, and behaved at all times as if there was a threat, rather than what Fox did here, which is not just to delay, but to testily approve the fact that Fox's technology on a virtually identical box four years ago, saying during contract negotiations that it was not trying to block sling, issuing the joint press release that we were talking about, and renouncing the copyright theory that we hear from Fox in this Court today in open court in the Aereo case. Third, and relatedly, the courts in most of those cases found that the technology was new, and was likely to have a huge and immediate impact on the marketplace. In contrast, Mrapp explained that this particular box, the hopper with sling, introduced, quote, no new capabilities to the market. That's at page 850. And the district court was certainly entitled to find it relevant, as we've been discussing, that if no harm of the sort that Fox referred to had materialized in the last eight years, it probably is not going to happen between now and January. And finally, the defendants in those cases were startups whose ability to pay was in serious doubt, which is just not true of Dish. That was all I intended to say by way of my presentation to this Court. I was not intending to go into the merits unless the Court has questions on the merits. Well, as to the generic question, if we were to reverse an irreparable harm, in other words, is there any chance that you think we would reach the merits or, I mean, not even the merits, but the merits of the merits, i.e., the likelihood of success, or would we remand it, or does it matter? Is there any reason we should reach the likelihood of success in addition to the irreparable harm? There is no reason. So if this Court doesn't touch irreparable harm, does not find it an abuse of discretion, there is no reason to go to the merits. If the Court reverses on irreparable harm, it would have to say why. In other words, presumably it doesn't issue a P.I. as a matter of law, but says the district court made some sort of mistake. But none of the mistakes that are cited bear at all on the merits. And the merits really would be something for the district court to address in the first instance. I will remind the Court also there's no reason to remand in light of anything. The district court will have summary judgment motions next month. The district court will be deciding the application of AREA and these copyright principles. He said the discovery cutoff was in August. Is there a summary judgment date? Yes. August, the third week of August, I think it's August 25th. I see. That's when the Rule 56 motions will be heard? The summary judgment motions will be filed. I presumably cross motions for summary judgment. And then one last point on the merits, because Mr. Stone was talking almost entirely about the contract. Your Honor's recollection of the law is correct. New York law says you just don't get a preliminary injunction or any injunctive relief on a contract except in extraordinary circumstances. There are no extraordinary circumstances. Which are different than the preliminary injunctive relief. Yes. Oh, yes, Your Honor. Very different from the PI standards. It's just not done, even at the end of a case when there is a breach of contract. And then one legal point I just would like to correct, which is that it is simply not true under Ninth Circuit law or the law of any court in this country that simply proving a breach of contract in a contract that relates to copyrighted material is itself a copyright violation. There are elements of a copyright violation. You have to prove an invasion of one of the exclusive rights listed in Section 106. Copyright, there is no breach of contract shortcut to that. The case MDY that Fox cites for that proposition goes out of its way to say that it does not stand for the proposition. And in fact, MDY finds a breach of contract and denies the relief based upon copyright because there wasn't an invasion of one of the rights of Section 106 like. And then we have this additional circularity here because the 2010 contract provision refers back to the legal rights, has an exception for the legal rights. So you're kind of backing out the copyright rights anyway. That's your view of it. That is exactly right. That is exactly why that provision was put in by DISH. It was put in by DISH in the first instance. By the way, is this case covered by New York law? Is that because the contract says so? It's because the answer is yes, and it's because the contract says so. And yes, that provision was put in by DISH precisely because it wanted to preserve not just its viewers' rights, but it went even broader than that and preserved any rights that it has to provide a DBR that allows a consumer to send the signal to themselves. Thank you, Your Honors. If there are no further questions, we respectfully request that the Court affirm the denial of the felony. Kagan. Mr. Hutchinson, do you have any questions? No. Okay. Thank you, Your Honors. All right. Thank you. So this issue will also govern for the permanent injunction. And we're in this odd world where it's clear from the Supreme Court. Tell me why. We're in an odd world because the Supreme Court has held that transmitting programming over the Internet is a public performance, which is a copyright right. The district court seems to have put us at a disadvantage because we have a license agreement that doesn't grant those rights but also expressly prohibits them. And the Court referred to that agreement as somehow diminishing our rights. Aren't you assuming success on the merits, the likelihood of success? Of course. Did you make that statement? Well, she used it to find there was no irreparable harm as well. And it was the district court herself who found that these are services at ER-299. I don't quite know what that means. I mean, is it any different than if somebody went out and bought this box from Best Buy? Yes. Because if you go and buy it from Best Buy and it breaks down, you're stuck with it. If you go to Best Buy and you don't pay for a cable system. That's true if you rent a car versus – I mean lease a car versus buy a car. But is that – that's a copyright difference? It is. And it has to be because there is a service involved in this. In other words, this is what was recognized in the Ariel case. What they're doing is they are offering something to make more money from their subscribers. And they're a commercial service. It isn't a consumer going out and getting a box and then figuring out, well, jeez, now I have to figure out where I'm going to get my programming to make this box usable. And what if the box goes on the fritz? What do I do here? As their own declarations made clear, if the box goes on the fritz, if it doesn't work, they use Amazon servers. But just to clarify that, you're not – I thought at some points in your brief you were suggesting that the service was something other than providing the box, that there was something they were doing, you know, in some centralized way that they were – they were doing – providing a different signal in order to get it to the Internet. But that's not true. The only thing that's different is that they're leasing the box instead of selling the box. Well, no, they've created the Sling software, which creates the transcoding that allows the signal to go over the Internet versus the broadcast signal. And that's different than if you bought the Sling box? No. There's just a chip in the Sling box. But this – this you have to go to the DISH website to access it, the DISH Anywhere website. You have to authenticate. The DISH computer at its Internet connects your home network with the DVR. So it then allows you to do it. It then authenticates. If your connection fails, as their own declaration pointed out, they then will route you through Amazon servers that they are – they, DISH, are leasing. And they will help you complete the connection with hopper transfers. They determine how long you can make the copies, where you can put them. And the contract – remember, the contract says you can't do this, nor can you authorize this. So we have a contract in – But then you're back – you know, you really got to stay away from there. Because then you're back to the merits. Well, but I think the merits are somewhat intertwined in the irreparable harm. I mean, I think what we're pointing out is that this is all stuff that they're doing that they're not authorized to do, which was recognized in all of these other cases. You say they're not authorized. They say otherwise, right? Well, they don't – there is no dispute that they do not have a license to do this. I mean, that is undisputed. But they – I mean, their view is the contract doesn't bar it and we're allowed to do it under the copyright laws. And then on the advertising issue, it is also undisputed that there is no service currently measuring viewership. But what about my concern, which is you say that there are all these other entities that are doing this. Well, let's assume they're doing it authorized, but they're still doing it. And if nobody's measuring it, then there's no competitive loss because everybody who's doing it is not getting measured. The question is – well, first of all, there was nobody that was doing this with broadcast television. That's why the district court's order refers to certain cable channels being provided over the Internet. Nobody has been providing broadcast television over the Internet. So that – just factually, that's not true. But the point is, the irreparable harm is that DISH is doing this without a license and we are losing viewership because it's not measured. I mean, you could have a – But what I'm saying is if nobody who's doing it is being measured, then there's no competitive loss in not being measured. But that isn't our claim of competitive loss. Our claim is they are doing it without authorization. There is nobody who's doing broadcast television, number one. Number two, if we negotiate a license to do that, then – The cable stations have broadcast television. Not over the Internet. This is streaming over the Internet. And so when you go to do that, you can build in protections. For example, if I go in and have a consensual negotiation, I can sort of take into account the fact that, well, Nielsen is not measuring this. Let's delay it until Nielsen does. That's one avenue which has been done. I assume you now know because you've done discovery whether Nielsen, in fact, is measuring. They're not. They are not. And their expert was simply wrong in doing that, you know. And they said their witnesses destroyed our case. The only witness cited by the district court was Mr. Rapp, an expert. And if you look at his declaration, it's really just a compendium of articles, which he then summarizes in his declaration of views of journalists about the industry. Weren't there others, Rentrac or others? None of which are measuring the Dish Anywhere or the Hopper Transfer Service. Nobody is measuring it, number one. Number two, this is an odd business where it doesn't matter if anyone else is measuring it. The only thing advertisers care about is Nielsen. And Nielsen is the coin of the realm, if you will. And Nielsen, it is undisputed, is not measuring this. And so if we go to trial and we turn around and say, well, there were a lot of unauthorized dish users that were going on the Internet, and because they went to the Internet, we lose the ability to value the commercial advertising because it wasn't being measured. At trial, when you turn around, because it's never been measured, you have no way of knowing what that harm is. And that's why in all these other cases, that has been found to be sort of the quintessential irreparable harm. We have no way of knowing because nobody is measuring it which commercials they didn't watch, which families, were they Nielsen families. Because if it's a Nielsen family who has dish service, you know, Nielsen does sort of a survey of a select sample. And if it's a Nielsen household that isn't doing it, that then has a disproportionate impact on devaluing the advertising. And none of this can really be quantified or determined because it's not being measured. And nobody disputed that. The other issue is for piracy. They sort of brush that off and say you're way over time. I will very, very quickly. I mean, this alone establishes irreparable harm. And I didn't get a chance to talk about it. But it's the court said, well, wait a second. Where's your evidence that dish is not doing something that you want for others to do to stop piracy? And our response is, and it's not speculative responses, we don't have an agreement with them. So tomorrow, Fox could say, everyone who distributes our programming, you're going to put a new watermark in every three seconds of every programming because we think that's the best way to stop piracy. And dish, because they have no constraints, no license, has no contractual obligation to do anything. They can say, you know what, we think that's just too expensive to do, Fox. And so that's irreparable harm. Thank you very much. Thank you, Your Honor. Thank you for a useful argument and an interesting case. Thank you. The case of Fox Broadcasting v. Dish Network is submitted and we are in recess. Thank you.
judges: Sabraw, NOONAN, BERZON